## In re CONSTANT CARE COMMUNITY HEALTH CENTER, INC., Debtor.

### Bankruptcy No. 88-5-1681-JS.

United States Bankruptcy Court, D. Maryland.

May 9, 1989.

Howard A. Rubenstein, Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, Md. for debtor.

Richard L. Wasserman, Venable, Baetjer & Howard, Baltimore, Md. for creditors' committee.

Randolph C. Knepper, Levin, Gann & Hankin, Baltimore, Md. for Dr. Harvey Webb, Jr.

## MEMORANDUM OPINION GRANTING DEBTOR'S MOTION TO REJECT EXECUTORY CONTRACT WITH HARVEY WEBB, JR.

JAMES F. SCHNEIDER, Bankruptcy Judge.

This matter came on for hearing upon the debtor's motion to reject an executory contract. The issue is whether an employment agreement which contains a deferred compensation provision continuing in effect after the debtor's employee has resigned is an executory contract which the debtor may reject as being burdensome to the estate. Based upon the following opinion, the motion [P. 18] to reject the executory contract will be granted.

## FINDINGS OF FACT

1. Constant Care Community Health Center, Inc. filed a voluntary Chapter 11 bankruptcy petition in this Court on June 8, 1988. The debtor-in-possession is engaged in the business of owning and operating a community health care center in the city of Baltimore, Maryland.

2. On the date the petition was filed, there was in effect an employment agreement between the debtor and Dr. Harvey Webb, Jr., dated June 1, 1986, which is set forth as follows:

"THIS EMPLOYMENT AGREEMENT, made this 1st day of June, 1986, by and between CONSTANT CARE COMMUNITY HEALTH CENTER, INC., a body corporate of the State of Maryland (the 'Employer'); and HARVEY WEBB, JR., D.D.S., M.P.H. (the 'Executive Director').

"WHEREAS, the Employer is a non-profit, charitable, educational and benevolent Maryland nonstock corporation organized to provide and deliver comprehensive health care and related services to individuals in the community of the State of Maryland; and

"WHEREAS, the Employer desires to employ the Executive Director upon the terms and conditions as hereinafter set forth, and the Executive Director desires to accept such employment.

"NOW, THEREFORE, in consideration of the premises aforesaid, the mutual covenants herein contained, and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

"[1.] *Employment.* The Employer hereby employs the Executive Director and the Executive Director accepts employment with the Employer to render executive and administrative duties and services for the Employer as determined by the Employer in the manner and to the extent contemplated by the laws of Maryland, the Articles of Incorporation, By–Laws and minutes of the Employer and the applicable canons of professional ethics as from time to time amended. The Executive Director's duties shall include, but shall not be limited to, the authority, responsibility and supervision for the administration of the Constant Care Community Health Center and its outreach projects and as more specifically provided in the Articles of Incorporation and By–Laws of the Employer. The Executive Director shall, to a reasonable extent, attend professional conventions and postgraduate and professional seminars and participate in professional societies; and shall do all things reasonably desirable to maintain and improve his professional skills. The Executive Director's other duties shall be such as the Board of Directors may from time to time reasonably direct.

"[2.] *Term.* This Agreement and the Executive Director's employment hereunder shall be effective as of July 1, 1985, and shall continue for a period of two (2) years, automatically renewing thereafter for successive two (2) year periods, subject to the right of either party to terminate this Agreement at any time upon ninety (90) days written notice to the other party specifying the date of termination.

"[3.] *Compensation.* The Employer agrees to pay the Executive Director during the term of this Agreement a salary of $80,500 per annum, subject to any authorized increase, payable at least monthly. The Employer also agrees to pay, on behalf of the Executive Director, dues for membership at a health club to be selected by the Executive Director. In addition, the Executive Director shall be included in all fringe benefits and policies which are available to other employees of the Employer. Further, the Executive Director shall have exclusive use of an automobile provided by the Employer and maintained at the Employer's expense.

"[4.] *Services.* The Executive Director agrees to devote substantially his full time and best efforts to the interests of the Employer. The expenditure of reasonable amounts of time for teaching, personal or outside business, charitable and professional activities shall not be deemed a breach of this Agreement provided such activities do not interfere with the duties and services required to be rendered to the Employer hereunder.

"[5.] *Expenses.* During the period of his employment, the Executive Director will be reimbursed for his reasonable expenses, including professional dues and membership, educational programs, entertainment, transportation and other business related expenses in accordance with the general policy of the Employer as

adopted by the Board of Directors, from time to time. In addition to such reimbursable expenses, the Executive Director shall be entitled to reimbursement, in the course of his employment by the Employer, of certain other necessary expenses of membership in civic groups, medical societies, and fraternal organizations, and all other items of reasonable and necessary professional expenses incurred by the Executive Director in the interest of the Employer.

"[6.] *Vacations.* The Executive Director shall be entitled, without loss of pay, to reasonable vacations, consistent with the established policy of the Employer. The timing of vacations shall be scheduled in a reasonable manner and the Executive Director shall not be entitled to additional compensation on account of his failure to take a vacation.

"[7.] *Disability.*

"a. As herein used, the term 'disability' shall mean the continuous and uninterrupted inability for a period of one (1) calendar month or more to perform the duties of Executive Director on behalf of the Employer, as hereinabove required by paragraph 1. of this Agreement, by reason of accident, illness or disease. The 'onset' of a disability shall be deemed to have occurred on the first day of such inability to perform duties.

"b. If the Executive Director is disabled, then for the first twenty-six (26) weeks of such disability, he shall receive his said salary. Payments of salary will be made as specified in paragraph 3. The foregoing notwithstanding, there shall be deducted from the salary which otherwise would be so payable to the Executive Director, during his disability, the proceeds, if any, of any disability insurance which the Employer may provide with respect to the Executive Director. The Executive Director shall receive all of the proceeds of any disability insurance which the Employer may provide with respect to the Executive Director, including such sums, if any, as the Employer shall itself receive as payments in respect of any such disability insurance, even though such proceeds are greater than or payable for longer periods than the salary continuation payments above provided.

"[8.] *Termination.* This Agreement shall terminate upon the occurrence of any of the following events, in addition to any other provision contained in this Agreement:

"a. The imposition of any restriction or limitation by any governmental authority having jurisdiction over the Employer or the Executive Director to such extent that either cannot engage in the delivery of comprehensive health care.

"b. The failure or inability of the Executive Director to faithfully and diligently perform the usual and customary duties of employment, or adhere to the provisions of this Agreement.

"c. The conviction of the Executive Director of a felony or a crime of moral turpitude.

"[9.] *Deferred Compensation.* If the Employer shall terminate the Executive Director's employment without cause, the Employer shall pay to the Executive Director, as deferred compensation, his full salary for a period of two (2) years from the date of such termination. If, however, the Executive Director shall voluntarily terminate his employment hereof, no such deferred compensation shall be payable. Notwithstanding anything to the contrary contained herein, without cause is defined to include the disability or death of the Executive Director.

"[10.] *Restrictions.* The Executive Director hereby agrees that he shall not, during the term of his employment and for a period of two (2) years after the termination of his employment, without cause by the Employer and while receiving deferred compensation under Section 10. hereof, within a five (5) mile radius of the Employer's facility at Division and Mosher Streets, Baltimore City, or within a two (2) mile radius of the Employer's facility at Dodge Park, Prince George's County, Maryland, directly or indirectly compete with the Employer in the delivery of health care and/or in the operation of any health maintenance organization.

"[11.] *Remedies.* In the event of a breach by the Executive Director of the provisions of paragraph 11., the Employer's sole remedy shall be to terminate any further payment of deferred compensation to the Executive Director. The Employer hereby expressly waives all other remedies at law or in equity, specifically including the recovery of damages from the Executive Director.

"[12.] *Modifications.* If any covenant or agreement contained herein is found by a court having jurisdiction to be unreasonable in duration, geographical scope or character of restriction, such covenant or agreement shall not be rendered unenforceable thereby, but rather the duration, geographical scope or character of restriction of such covenant or agreement shall be deemed reduced or modified with retroactive effect to render such covenant or agreement reasonable, and such covenant or agreement shall be enforced as so modified.

"[13.] *Severability.* The entire understanding between the parties has been incorporated in this Agreement. This Agreement shall be severable so that if any term, clause or provision hereof shall be deemed invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the remaining terms, clauses or provisions hereof; the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof they would have executed an agreement containing all the remaining terms, clauses and provisions of this Agreement.

"[14.] *Miscellaneous.* The Executive Director acknowledges that he has read this Agreement, the Articles of Incorporation and the By–Laws, that he fully understands all provisions and that he has received a copy of all of the above for his own use.

This Agreement has been entered into in the State of Maryland and shall be construed and interpreted in accordance with the laws of the said State. No amendments or additions of this Agreement shall be binding unless in writing and signed by both parties, except as herein otherwise provided.

"IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

ATTEST:

/s/_____
Secretary
A. Carter Middendorf

CONSTANT CARE COMMUNITY
HEALTH CENTER, INC.

By: /s/_____
Cecelia Tilghman,
President

'Employer'

WITNESS:

/s/_____
Gregory J. Williams

/s/_____
HARVEY WEBB, JR., D.D.S., M.P.H.
'Executive Director' "

*Debtor's Exhibit No. 1.*

3. On April 14, 1987, the board of directors of Constant Care requested Dr. Webb's resignation, although he was not in breach of the Agreement. The board reaffirmed the debtor's promise to continue Webb's benefits and salary payments.

4. By the following letter dated April 15, 1987, Dr. Webb acquiesced to the board's request:

Dear Board of Directors:

At the Board meeting of April 14, 1987, you required my resignation as Executive Director of Constant Care Community Health Center, Inc. You further advised me that my full salary and benefits, per the contract, would continue for 2 years after the date of termination. Based on that commitment, I resign as Executive Director of Constant Care community Health Center, Inc. effective Midnight April 14, 1987.

Sincerely,
/s/
Harvey Webb, Jr.
HWJr./pad
AGREED TO BY:

/s/_____
Cecelia Tilghman
Chairperson

/s/_____
Theo C. Rodgers
Treasurer

*Debtor's Exhibit No. 2.*

5. Pursuant to paragraph 9 of the agreement, Dr. Webb's termination without cause entitled him to receive full compensation for a period of two years from the date of termination, that is, until April, 1989. Dr. Webb's compensation under the agreement included not only an annual salary of $80,500, but also the use of an automobile, which in this case was a 1986 Audi.

6. The debtor filed the instant motion to reject executory contract on July 1, 1988, seeking to reject the Agreement because it was burdensome to the estate.

7. Dr. Webb filed an opposition [P. 31] to the motion, arguing that the agreement was no longer executory because he had fully performed his obligations thereunder.

8. The Court issued an opinion in this case from the bench on August 16, 1988, which it now supplements by the instant opinion.

CONCLUSIONS OF LAW

1. Pursuant to § 365(a) of the Bankruptcy Code, a bankruptcy trustee may assume or reject any executory contract or unexpired lease of the debtor, with the approval of the bankruptcy court. 11 U.S. C. § 365(a) (1982 & Supp. IV 1986).

2. Constant Care Community Health Center, Inc. may assume or reject an executory contract or unexpired lease because § 1107(a) of the Bankruptcy Code gives to a debtor-in-possession the same rights and powers as a trustee serving in this case would have:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in section 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

*11 U.S.C. § 1107(a)* (1982 & Supp. IV 1986).

3. "The courts have for years struggled to define the meaning of the term 'executory contract' as used in the bankruptcy or rehabilitative context. *See,* Countryman, Executory Contracts in Bankruptcy, 57 Minn.L.Rev. 439 (1973) and 58 Minn.L. Rev. 479 (1974). It is conceded in the legislative history to § 365(a) of the Code that no precise definition exists but it is noted that executory contracts generally include contracts on which performance remains due to some extent on both sides. H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) 347, U.S.Code Cong. & Admin.News 1978, p. 5787, 5963, 6303; S.Rep. No. 95–989, 95th Cong.2d Sess. (1978) 48, U.S.Code Cong. & Admin.News 1978, p. 5787, 5834. More specifically, however, an executory contract has been defined as one in which a party binds himself to do *or not do a particular thing,* whereas an executed contract is one in which the object of the agreement is already performed. *Farrington v. Tennessee,* 95 U.S. 679, 683, 24 L.Ed. 558 (1877); *In re American Magnesium Company,* 488 F.2d 147, 152 (5th Cir. 1974)." *In re Rovine Corp.,* 5 B.R. 402, 404 (Bankr.W.D.Tenn.W.D.1980).

4. Other courts which have addressed the question have described the attributes of executory contracts. *See e.g. In re Cherry,* 78 B.R. 65, 68 (Bankr.E.D.Pa.1987) (executory contract is one which has not yet been fully completed or performed on either side); *In re Cooper,* 47 B.R. 842, 844 (Bankr.W.D.Mo.1985) (executory contract is generally taken to mean any agreement in which substantial performance obligations remain on each party); *In re Lubrizol,* 756 F.2d 1043, 1045 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (a contract is executory if the obligations of both parties to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other).

5. The Court in *Rovine, supra,* held that a covenant not to compete was an executory contract because performance remained due to some extent on both sides. 5 B.R. at 404.

6. In a case factually similar to the instant case, it was held that although the former president of a corporation had resigned, his employment contract was executory because he was still under an obligation for two years to refrain from competing with the former employer. *Matter of Central Watch, Inc.,* 22 B.R. 561, 564 (Bankr.E.D.Wis.1982).

7. In *Lubrizol, supra,* the Fourth Circuit reviewed a contract in which the debtor had agreed to refrain from using a metal coating process technology in return for the payment of royalties. Together with the duty of non-use of the technology, the debtor's obligations included the requirement to notify Lubrizol of any patent infringement suits. The Court held that "[t]he unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory...." 756 F.2d at 1045. The Court noted that the unperformed, continuing duty of forbearance was a key factor in determining that the contract was executory. *Id.* at 1046. The obligation in *Lubrizol* went beyond a mere promise to pay money, because the debtor promised in return to refrain from using the technology and was required to perform certain duties. *Id.*

■ 8. The employment contract in the instant case is an executory contract. Because Dr. Webb agreed to refrain from competition with the debtor for a two-year period, his obligation of forbearance constitutes a continuing duty, a violation of which would have been a material breach of the contract. Performance remained due on both sides for two years, because the debtor has an obligation to pay Dr. Webb and permit him to use the Audi automobile. It doesn't matter that Dr. Webb is no longer actively employed by the debtor. Because the contract is executory, the debtor has the right to reject it, conditioned upon the concurrence of the bankruptcy court.

■ 9. In determining whether to permit a debtor to reject an executory contract, the Court defers to the debtor's sound business judgment. This rule has generally been applied by courts to discretionary actions and decisions in the realm of corporate litigation, as well as to a debtor's decision to affirm or reject an executory contract. *Lubrizol, supra,* at 1046–47. The issue is "whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Id.* at 1047. *See also, In re Meehan,* 59 B.R. 380, 385 (Bankr.E.D.N.Y. 1986) (court framed the issue as whether rejection of the contract would benefit general unsecured creditors); and *In re Rovine Corp., supra,* at 404 (debtor-in-possession has the right and power under § 365(a) to reject executory contracts which are burdensome to the estate.)

■ 10. In the context of the facts in the instant case, there is absolutely no question that the executory contract is burdensome to the bankruptcy estate. By permitting Dr. Webb to receive his full salary for a two-year period after his resignation, the rights of creditors might be unduly prejudiced and it would be in their best interests for the contract to be rejected.

11. According to Bankruptcy Code § 365(g), the rejection of an executory contract amounts to a breach of the contract. Therefore, the non-breaching party injured by the rejection may file a claim for damages as a creditor of the estate. However, as in any other litigation involving a breach of contract, the injured party must exert reasonable efforts to mitigate damages.

For all these reasons, the motion of the debtor-in-possession to reject the employment agreement with Dr. Webb as an executory contract pursuant to § 365(a) will be GRANTED.

ORDER ACCORDINGLY.