**In re JR. FOOD MART OF ARKANSAS, INC.**

**JR. FOOD MART OF ARKANSAS, INC., Plaintiff,**

**v.**

**Everett G. ATTEBURY, Defendant.**

**Bankruptcy No. 90–50419 S.**

United States Bankruptcy Court, E.D. Arkansas, Pine Bluff Division.

Aug. 28, 1991.

Allen Bird, Little Rock, Ark., for debtor.

Hani Hasmem, Monticello, Ark., for defendant.

Peter Heister, Little Rock, Ark., for unsecured creditors committee.

ORDER GRANTING DEBTOR'S MOTION TO REJECT EXECUTORY CONTRACT AND DIRECTING DEFENDANT TO TIMELY FILE CLAIM FOR DAMAGES PURSUANT TO 11 U.S.C. § 502(g)

MARY D. SCOTT, Bankruptcy Judge.

This adversary proceeding was commenced when the debtor terminated the employment of Everett Attebury and filed a Motion seeking a Declaratory Judgment that the debtor had cause to terminate Mr. Attebury's employment because he breached his fiduciary duties to the company. Alternatively, the debtor is seeking approval for the rejection of the employment contract pursuant to Bankruptcy Code section 365. The matter came on for trial March 19, 1991. Mr. Attebury also filed a separate Motion to Assume Executory Contract and, by agreement of the parties, this Motion was considered at the same time.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a). Moreover, the Court finds that this is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(1) as exemplified in 28 U.S.C. § 157(b)(2)(O).

At the conclusion of the debtor's case-in-chief the Court found that Mr. Attebury did not breach his fiduciary duties to the company and granted his Motion to Dismiss debtor's Complaint for a Declaratory Judgment that his employment was terminated for cause. The Court now considers

the debtor's alternate request to reject Mr. Attebury's Employment Agreement pursuant to section 365 of the Bankruptcy Code as well as Mr. Attebury's request that the debtor assume his Employment Agreement. The parties presented testimony and requested an opportunity to submit post-trial briefs. Those briefs have now been filed, and the matter was taken under submission June 25, 1991.

## FACTS

Mr. Attebury was the owner of Crown Convenience Stores, Inc. ("Crown"), the forerunner to the debtor, Jr. Food Mart of Arkansas, Inc. ("Jr. Food Mart"). In February 1985, Mr. Attebury sold all of his capital stock in Crown to Dr. William T. Paine, the present owner of the debtor.[1] At the time of the sale, Crown (now Jr. Food Mart) entered into a separate Employment Agreement with Mr. Attebury. (Plaintiff's Ex. 1). Under the terms of the Employment Agreement, Mr. Attebury was to be paid a salary of $5,000 per month, plus a two percent (2%) annual increase over the 10–year term of the contract. He would continue as President to "assist in the management of day-to-day operations of the Corporation's business." Mr. Attebury's precise duties, however, could be "extended or curtailed by the Corporation from time to time." (Para. 4, Employment Agreement, Plaintiff's Ex. 1).

After Mr. Attebury sold his Crown shares, Dr. Paine continued to operate the convenience store franchises under the Crown name. Ultimately the name was changed to Jr. Food Mart of Arkansas, Inc. (Deposition testimony of Howard V. Blair, Defendant's Ex. 5). Mr. Blair, President and Chief Operating Officer of Jr. Food Marts of America, Inc.[2], which authorizes and sells convenience store franchises, tes-tified that Mr. Attebury from 1974/75 expanded the operations to include in excess of ninety stores. Jr. Food Mart of Arkansas, Inc., the debtor, now operates "68 to 70 stores". (Deposition testimony of Howard Blair, p. 5, Defendant's Ex. 5).[3] Mr. Blair's testimony also revealed that his company's franchise agreements were initially signed by Mr. Attebury, personally, then with Crown and finally with Jr. Food Marts of Arkansas, Inc. when the name was changed. He also testified that Mr. Attebury gave his personal guarantee on the performance of the franchise agreements as well as the store leases, and that he is still liable as well as "technically, the approved franchisee." (Deposition of Mr. Blair, p. 9, Defendant's Ex. 5). The franchise documents were never changed or assigned after Mr. Attebury sold his business to Dr. Paine.

Neither the testimony nor the documents reveal the history of how and when Jr. Food Mart succeeded to the rights and/or liabilities of Crown Convenience Stores, Inc., but this fact is not in dispute as evidenced by the parties' arguments which assume the succession and are limited to the relationship between Mr. Attebury and the debtor. The Court, therefore, does not consider this gap in the history of the debtor to be a deterrent to its decision.

The debtor terminated Mr. Attebury's employment shortly after it filed its Chapter 11 petition on November 5, 1990. (Defendant's Ex. 1) In the present proceeding, debtor, pursuant to 11 U.S.C. § 365, seeks to reject Mr. Attebury's Employment Agreement contending that, in its business judgment, rejection of this Agreement will benefit the debtor's unsecured creditors. Mr. Attebury seeks assumption of this Employment Agreement, contending that re-

---

1. Dr. Paine has not filed a separate bankruptcy case.

2. Not to be confused with the debtor, Jr. Food Mart of Arkansas, Inc.

3. Relevant deposition testimony of Mr. Blair on p. 8 reveals the following:
   One of the services we provide is a real estate staff that goes out and finds locations, re-searches them, analyzes them and secures these properties. We make a commitment to all of our franchise owners, based on their ability to expand, and our real estate staff goes out and finds locations. We secure an option in most instances and then find a developer to develop the property on our terms, execute a lease with them and then we assign the rights of that lease in the form of a Jr. Food Mart store lease contract.

jection would be inequitable and unconscionable and the resulting irreparable harm to him would far outweigh any benefit to the bankruptcy estate.

## DISCUSSION

Section 365 of the Bankruptcy Code, in relevant part, provides that "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." Pursuant to 11 U.S.C. § 1107(a), a debtor-in-possession has the same rights, powers and duties as a trustee, including the right to reject executory contracts. *See In re Constant Care Community Health Center*, 99 B.R. 697 (Bankr.D.Md.1989); *In re Russell*, 60 B.R. 42 (Bankr.W.D.Ar.1985); *In re Salem Bank Bldg. Ltd. Partnership*, 40 B.R. 574, 575 (Bankr.W.D.Va.1983). There is no dispute that the Attebury employment contract is executory. The only issue remaining is whether or not the Court should grant the debtor's request to reject this Agreement or deny the request and grant Mr. Attebury's request to direct the debtor to assume the Employment Agreement.

### The Business Judgment Test

Under the Bankruptcy Act of 1898, courts did not approve rejection of an executory contract unless it was "onerous" or "burdensome" to the estate of the debtor. *See generally*, Silverstein, *Rejection of Executory Contracts*, 31 Chi.L.Rev. 467, 468–72 (1964). Under the Bankruptcy Code, however, courts have replaced the "burdensome" standard with the "business judgment" test. *See In re Midwest Polychem, Ltd.*, 61 B.R. 559, 562 (Bankr.N.D.Ill.1986); *In re Chi–Feng Huang*, 23 B.R. 798, 800 (9th Cir.B.A.P.1982) (hereinafter *Huang*).[4]

Several courts have concluded, under the business judgment test, that the effect of rejection on the non-debtor party is not a relevant factor. *See Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187 (6th Cir.) *cert. denied* 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); *Wheeling–Pittsburgh Steel Corp. v. West Penn Power Co.*, 72 B.R. 845 (Bankr.W.D.Pa.1987). Other courts have applied the business judgment test and also considered the effect of rejection on the non-debtor party. Even in these cases, however, the primary concern remains; whether rejection would benefit the general unsecured creditors. *Polychem*, 61 B.R. at 562; *In re Meehan*, 46 B.R. 96 (Bankr.E.D.N.Y.1985); *Huang*, 23 B.R. at 800.

The Second Circuit found that the business judgment test requires the court to exercise its discretion fairly in the interests of all who have dealt with the debtor. *Control Data Corp. v. Zelman*, 602 F.2d 38, 43 (2d Cir.1979). Under this analysis, benefit for the general unsecured creditors notwithstanding, the court may withhold approval where the party whose contract stands to be rejected will likely be damaged disproportionately to any potential benefit to be derived by the general unsecured creditors. *See, also, Huang*, 23 B.R. at 801. The *Huang* appellate panel, however, rejected the contention that a motion to reject could be denied merely because of unfairness to the party whose contract is to be rejected, or because of the disappointment of legitimate expectations. *Id.* at 801–802.

Cases involving employment agreements as executory contracts are rare, but two courts have directly addressed the rejection of an employment contract by a debtor. In *In re Instituto Medico Del Norte, Inc.*, 76 B.R. 14 (Bankr.D.Puerto Rico 1987), the court approved the rejection of the employment contract between the debtor and the doctor who ran its radiology department. The court made multiple findings of fact and concluded that the debtor relied upon reasonable business judgment factors to arrive at its decision to reject the contract. The court approved the rejection of the

---

**4.** In special instances, such as the rejection of collective bargaining agreements, a third test is employed, which involves an equitable balancing of the relative benefits and detriments both to the debtor and to the other affected party. *Matter of Smith Jones, Inc.*, 26 B.R. 289, 293 (Bankr.D.Minn.1982). The reason for looking more closely at the relative effects of the rejection of executory collective bargaining contracts is that the court must balance the policy goals of the Bankruptcy Code against those of the National Labor Relations Act.

employment agreement primarily because there would be a benefit to the estate. *Id.* at 16. In *In re Constant Care Community Health Center, Inc.*, 99 B.R. 697 (Bankr. D.Md.1989), the court also deferred to the debtor's "sound business judgment," and approved the rejection of an employment contract. The contract provided that one of the doctors was to receive his full salary for a two-year period after the termination of his employment for any cause other than voluntary termination. *Id.* at 699. Focusing on this contractual provision, the court had little trouble finding that the contract was burdensome to the estate, that it might unduly prejudice unsecured creditors, and that it was in the best interests of the estate to reject the contract. *Id.* at 702.

Notably, the *In re Instituto Medico* and *In re Constant Care* courts both approved rejection of the employment contracts in summary fashion. Neither court considered the adverse impact of the rejection on the respective non-debtor parties.

Under the "strict" business judgment test analysis, the court need only ask if the debtor is saving money by rejecting Mr. Attebury's employment contract. Jr. Food Mart would save approximately $5,000.00 per month for the remaining term of the 10–year Agreement.[5] Testimony by the debtor's current Chief Executive Officer, Garland Ridenour, indicated that Mr. Attebury's employment with the debtor had annually cost the company from $168,-000.00 to $170,000.00. This figure, however, included the monthly salary, as well as payment of life insurance premiums, auto and health benefits and reimbursement of expenses. Additional testimony revealed that the Employment Agreement *per se* only covers Mr. Attebury's monthly salary payment and employment related benefits. (Paragraph 8 of Employment Agreement). Payments for insurance premiums on Mr. Attebury's life, some $7,000.00 per month, are not part of his Employment Agreement, but represent an obligation of the debtor under the initial Sales Agreement. (Plaintiff's Ex. 2). The debtor is not seeking to reject this Sales Agreement. Mr. Ridenour, on cross-examination, agreed that the Employment Agreement and Sales Agreement are separate.[6]

Thus, it appears that by rejecting the Employment Agreement, the debtor would decrease its costs by the sum of Mr. Attebury's salary and employment benefits for approximately the four years remaining under the Agreement. Rejection appears to be a valid exercise of the debtor's business judgment, and not capricious or one made in bad faith. Consequently, under this "strict" business judgment test analysis, the Court should approve the debtor's rejection of Mr. Attebury's employment contract.

Under the "liberal" business judgment test analysis, courts look to the impact upon the party whose contract is sought to be rejected and compare the benefit to be received by the debtor against the harm to the non-debtor party. Initially, any analysis appears to consider the fairness to the non-debtor party. Courts, however, as noted above, have not denied rejection under this test solely because of unfairness to the non-debtor party.

In support of his contention that he will be irreparably harmed, Mr. Attebury argues that at 70 years of age his prospects for comparable employment are not good. Further, he points out that he remains personally liable on the debtor's Citgo gasoline contracts as well as almost all of the leases

---

**5.** Four years and two months, or approximately $250,000.00.

**6.** Testimony revealed that Mr. Attebury and Dr. Paine contemplated an overall financing arrangement to accommodate tax ramifications of the seller financed sale. There was no evidence that rejection of the Employment Agreement affects the debtor's obligation to pay Mr. Attebury's heirs $2,000,000.00. The life insurance premiums paid by the debtor on Mr. Attebury's life secure this obligation. Likewise, there was no evidence that rejection of the Employment Agreement affects Dr. Paine's personal obligation to Mr. Attebury under the Sales Agreement. (Paragraph 2.03(b), Sales Agreement, Plaintiff's Ex. 2). Dr. Paine is obligated to begin making $5,000.00/month payments for 120 months ($600,000.00) beginning in early 1995. (Paragraph 2.03(b), Sales Agreement, Plaintiff's Ex. 2).

for Jr. Food Mart locations. Mr. Attebury, however, does not explain how denying the debtor's request to reject his employment contract would in any way lessen his potential liability under these other contracts.

Mr. Attebury also contends that his expertise in the convenience store business was and is an essential element to the development of the debtor's business. Mr. Ridenour testified, however, that when he took over as President of the debtor the company was losing money at a tremendously rapid pace and would have been forced to cease operations within a couple of months. In any event, paragraph 4 of the Employment Agreement seems to moot this irreconcilable dispute. It provides that the debtor always had an unlimited right to curtail Mr. Attebury's duties. The debtor cannot be forced to assign any duties to Mr. Attebury. Mr. Attebury agreed to this term.

Mr. Attebury relies on *In re Midwest Polychem*, 61 B.R. 559 (Bankr.N.D.Ill.1986) and *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr.W.D.Wash.1983) in support of his contention that the detrimental effect upon him by the debtor's rejection of his employment contract is reason for this Court to deny rejection. In *Midwest Polychem*, 61 B.R. at 559, however, the contract the debtor sought to reject happened to be with another Chapter 11 debtor. The court had to balance the effect of rejection upon both debtors. Likewise in *Petur U.S.A.*, 35 B.R. at 561, the court disallowed rejection, not because of the unfair effect upon the other party, but because the debtor failed to demonstrate a benefit to the estate that would outweigh the potential breach of contract claim against the estate. Neither case involved an employment contract.

Under the circumstances presented in this case, it would be difficult to conclude that continued payments of $5,000 per month plus employment benefits for no work could be anything other than a financial burden to the estate affecting any distribution to unsecured creditors. Further, assumption of an executory contract has the effect of giving expenses and liabilities incurred under the contract administrative expense priority. *In re Coast Trading Co.*, 744 F.2d 686, 692–93 (9th Cir.1984). As such they would receive priority payment in any distribution prior to unsecured creditors. *R & O Elevator Co., Inc. v. Harmon*, 93 B.R. 667 (D.Minn.1988).

The Court finds that the debtor has met its burden of proof that the general unsecured creditors will be benefited by rejection of Mr. Attebury's employment contract. Under either interpretation of the business judgment test, the debtor's decision to reject this executory contract should be approved. Mr. Attebury's remedy is to file a claim for breach of the rejected Employment Agreement and he will be given an opportunity to do so.

### DAMAGES

Pursuant to 11 U.S.C. § 365(g), the rejection of Mr. Attebury's executory Employment Agreement constitutes a breach of the contract. Such a breach may result in a claim against the estate. Mr. Attebury, pursuant to 11 U.S.C. § 502(g), will be given thirty (30) days from entry of this Order to file a claim. The debtor will be given twenty (20) days thereafter to file any objection it may have to allowance of the claim. If an objection is filed, a hearing will be held by subsequent notice of the Court. If no claim is timely filed, this adversary proceeding will be closed. Likewise, if no timely objection to any claim by Mr. Attebury is filed, the claim will be allowed.

IT IS SO ORDERED.