**In re Robert CHERRY and Sheila Cherry, Debtors.**

**DOCK C–FOOD LTD. and Elliot Menkowitz, Plaintiffs,**

**v.**

**Robert CHERRY, Defendant.**

**Bankruptcy No. 87–01760S.**
**Adv. No. 87–0775S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 22, 1987.

---

**66**

John Francis Murphy, Doylestown, Pa., for plaintiffs.

Charles M. Golden, Philadelphia, Pa., for debtor/defendant.

Edward Sparkman, Philadelphia, Pa., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant matter, which we consider to be, in substance, a Motion for relief from the automatic stay in the form of an Adversary proceeding, presents a difficult issue of determining whether and on what grounds a former employer is entitled to seek to enforce a state court decree upholding a pre-petition restrictive employment-contract covenant against a Chapter 13 debtor. We believe that none of the several grounds asserted by the employer—including the alleged inapplicability of the stay to civil contempt proceedings and the alleged absence of a "claim" of the employer against the Debtor—are in themselves a sufficient basis for relief. However, balancing the relative hardships of the parties in light of, *inter alia*, the employer's disavowal of any attempt to seek monetary damages, and the Defendant/Debtor's dogged, post-petition defiance of a state court injunction, cause us to grant relief to the employer.

The Defendant/Debtor, ROBERT CHERRY (hereinafter referred to as "the Defendant"), and his co-Debtor Wife, SHEILA CHERRY, filed this joint Chapter 13 bankruptcy case on April 9, 1987. The instant Adversary Complaint was filed by DOCK C–FOOD, LTD. and its principal shareholder, ELLIOT MENKOWITZ, a practicing surgeon (hereinafter referred to as "the Plaintiffs"), on August 25, 1987. The Complaint was in two Counts, the first of which requested a declaration that conducting a state court hearing on August 27, 1987, to hold the Defendant in contempt of a state court injunction enforcing a restrictive employment-contract covenant would not be violative of the automatic stay arising from the bankruptcy; and the second of which, alternatively, sought relief from the stay to conduct the hearing in the event that the court determined that the stay did apply. Contemporaneously with the Complaint, the Plaintiffs filed Motions for a Temporary Restraining Order (hereinafter referred to as "TRO") and for a Preliminary Injunction.

We refused to grant the TRO and expressed a belief that the automatic stay did apply to the state-court contempt proceedings. After consultation with the Defendant's then-counsel, we scheduled a hearing on the stay motion on September 1, 1987. However, on September 1, 1987, the Defendant's then-counsel advised that new counsel had been retained, and requested a continuance until the following day, when the new counsel was available. We granted this request over the Plaintiffs' objection.

On September 2, 1987, the Defendant's new counsel appeared and requested a further continuance in order to file and be heard on a proposed Motion to reject the Defendant's employment contract with the Plaintiffs in the Debtors' main bankruptcy case. We denied that Motion, and directed that the hearing proceed. However, at the close of the hearing, we agreed to hold the stay motion under advisement until the Mo-

tion to reject was filed and heard on September 10, 1987, and we requested both counsel to submit Briefs on all outstanding matters on or before September 9, 1987. Although the Motion to reject was filed on September 3, 1987, the parties decided that the record made on September 2, 1987, could suffice for the resolution of all outstanding matters, and the hearing of September 10, 1987, was cancelled. The Plaintiffs' Brief was filed on September 8, 1987, and that of the Defendant arrived on September 10, 1987.

Because the Plaintiffs' filing is in the form of an Adversary proceeding, we are obliged to present our decision in the form of Findings of Fact, Conclusions of Law, and a Discussion. We note that, at the hearing, the Debtor called its general counsel, Douglas Breidenbach, Esquire, and Robert Kearney, apparently its fiscal officer, as witnesses. The Defendant also testified briefly.

## B. FINDINGS OF FACT

1. The corporate Plaintiff was formed by erstwhile longtime friends, the individual Plaintiff, who provided essentially financial backing; the Defendant, who has been a successful vender of seafood to restaurant establishments from age 12 to his present age of 48; and Mr. Kearney, who apparently managed the business's books.

2. The Defendant was employed pursuant to an Agreement of January 13, 1986, which included a "non-competition covenant," whereby the Defendant agreed that, for a period of three years after any termination of the Agreement "for whatever reason," the Defendant would not engage in the business of "acquiring seafood, and other food products" for sale to businesses similar to those served by the corporate Plaintiff "within the marketing area of the Company."

3. On October 29, 1986, the Defendant was fired by the Plaintiffs, for allegedly repeatedly taking funds from the business for personal use without authority to do so.

4. In the 10–month period from the commencement of the business through the date of the Defendant's separation, the corporate Plaintiff had gross sales of $1.2 million.

5. Subsequent to his separation, the Defendant, by his own admission, continued to work in the business of selling seafood in the Philadelphia metropolitan area. As a result, the corporate Plaintiff filed an action in the Court of Common Pleas of Montgomery County, Pennsylvania (hereinafter referred to as "the state court") to, *inter alia*, prevent the Defendant from continuing in this business in violation of the Agreement of January 13, 1986.

6. On December 3, 1986, the state court issued an Order enjoining the Defendant from working in any business concerning the sale of *any foods* in Philadelphia, Chester, Montgomery, Bucks, and Delaware Counties, Pennsylvania, and in Camden, Ocean, and Atlantic Counties, New Jersey for a period of *two* years.

7. By his own admission, the Defendant continued to work in the seafood sales business after the issuance of this injunction, and the corporate Plaintiff commenced contempt proceedings against the Defendant. This resulted in a conference before the state court judge who issued the injunction on March 4, 1987, who warned the Defendant to obey his previous order without entering any further order.

8. The Defendant did not inform the Plaintiffs of his bankruptcy filing on April 9, 1987, and they were unaware of it until August 21, 1987.

9. In the meantime, after the filing of the bankruptcy Petition, the Defendant continued to work in the seafood sales business as before, and the Plaintiffs filed another contempt Petition which was relisted for a hearing in the state court on August 27, 1987.

10. In the 10–month period between the Defendant's separation through the date of the hearing, the corporate Plaintiff's gross sales were but $276,000.00.

11. Attorney Breidenbach certified that the corporate Plaintiff would not pursue any monetary claims against the Defendant in the state court action, but would confine

relief sought to prospective, injunctive relief.

12. A hearing on the contempt petition in the state court could probably not be scheduled until November, 1987.

13. While admitting that his past efforts to remain in the seafood sales business were misguided, the Defendant stated that he had an offer to work for a company selling other food products in the Philadelphia area, and that concern about the enforceability of the Agreement was the only drawback to his being able to take this position.

14. The Defendant also stated that practically his only work experience was in the seafood sales business, and that he would be unable to obtain employment and fund the Debtors' plan if enforcement of the state court injunction were not stayed, or at least limited to only the *seafood* sales business so that he could accept the position mentioned in paragraph 13.

15. On September 3, 1987, the Defendant, for the first time, sought to reject the Agreement of January 13, 1986, as an executory contract.

## C. CONCLUSIONS OF LAW

1. The Agreement of January 13, 1986, having been terminated pre-petition, is no longer an executory contract, and it therefore cannot be rejected by the Defendant at this time.

2. The automatic stay does apply to civil contempt proceedings, and, therefore, the Plaintiffs cannot maintain such proceedings against the Defendant unless this Court grants them relief from the automatic stay.

3. Irrespective of whether the Plaintiffs have a "claim" against the Defendant, per 11 U.S.C. § 101(4), the Plaintiffs are entitled to relief only if they can establish that "the balance of hardships" tips in their favor.

4. The Plaintiffs are entitled to relief from the automatic stay because the recognition of the Plaintiffs that they must confine themselves to prospective, post-petition, injunctive relief; the diminished impact of the stay on the Defendant's post-petition conduct; our confidence that the state court will balance the equities between the parties and possibly modify its injunction; the Defendant's past defiance of the state court injunction; and the severely deflated business of the Plaintiffs since the Defendant's separation, which, in light of his defiance of the injunction, is very likely to be attributed to the Defendant's competition with the corporation Plaintiff, *inter alia*, tip the balance of the hardships in their favor.

## D. DISCUSSION

### 1. THE DEBTOR IS NOT ENTITLED TO REJECT A CONTRACT TERMINATED PRE–PETITION, AS IT IS NO LONGER AN "EXECUTORY CONTRACT"

This case presents several difficult questions concerning the impact of the automatic stay. However, the issue which the Defendant's new counsel has attempted to introduce into the case—whether the Agreement of January 13, 1986, is an executory contract which the Defendant may reject at this juncture—is an easy question to resolve.

In *In re W. & L. Associates, Inc.,* 71 B.R. 962 (Bankr.E.D.Pa.1987), we introduced a rather broad conception of the term "executory contract." In that Opinion, we declined to religiously confine the definition of "executory contract" to that purportedly proposed by Professor Vern Countryman in his article, *Executory Contracts in Bankruptcy: Part I,* 57 MINN.L.REV. 439, 450–62 (1973), i.e., contracts concerning which performance remains due on both sides. Rather, we suggested that the concept merely took its traditional form as that of a contract that has not yet been fully completed or performed on *either* side. *Id.* at 965–66.

Nevertheless, we recognized some limitations from classifying every contract that ever existed as "executory." One important limitation noted was that a contract already terminated pre-petition cannot be deemed executory. *Id.* at 966. Thus, we

distinguished the *W. & L.* factual situation from that of *Kendall Grove Joint Venture v. Martinez-Esteve,* 59 B.R. 407 (S.D.Fla. 1986), in which the buyer had obtained a pre-petition decree of specific performance concerning the contract in issue. *See also, e.g., In re Roxse Homes, Inc.,* 74 B.R. 810, 815–18 (Bankr.D.Mass.1987).

■ Clearly, the situation here mirrors that in *Kendall Grove* and *Roxse Homes* rather than that presented in *W. & L..* Here, the corporate Plaintiff had already terminated and obtained specific performance of the crucial aspect of the contract in issue pre-petition, on December 3, 1986. Thus, it was no longer executory as of April 9, 1987, the date of the Debtor's filing. *Cf. In re Howard Industries, Inc.,* 56 B.R. 5, 6 (Bankr.D.N.J.1985); *In re Cooper,* 47 B.R. 842, 844 (Bankr.W.D.Mo.1985) (non-competition clauses found incapable of rejection per § 365 because, after employee's termination, the employer had no further duties of performance).[1]

This aspect of the case emphasizes the importance of timing in the invocation of relief from the bankruptcy courts. Had the Defendant filed his Petition prior to October 29, 1986, or even prior to December 3, 1986, he may have been able to successfully reject the Agreement and the non-competition clause with it under the precepts which we set down in *W. & L.* Had he been able to do that, the Plaintiffs' "cause" for relief from the automatic stay, pursuant to 11 U.S.C. § 362(d)(1), would have evaporated. The Defendant's new counsel was undoubtedly aware of this; unfortunately, he came into the scene too late.

This issue, while it could not be resolved in favor of the Debtor, does place the matter in a perspective which reveals that the matter is a far closer case than it appears at first blush. There is absolutely nothing sacrosanct about the parties' restrictive covenant and, with proper timing, its impact would have been eminently avoidable by the Debtor.

## 2. THE POSITIONS OF THE RESPECTIVE PARTIES CONCERNING RELIEF FROM THE AUTOMATIC STAY

Besides refuting the Defendant's executory contract argument, the Plaintiffs argue that the automatic stay does not apply to this proceeding and, in the alternative, assert seven other reasons why they believe that they are entitled to relief from the stay for "cause," pursuant to 11 U.S.C. § 362(d)(1). In so doing, they eschew this Court's suggestion at the close of the hearing on September 2, 1987, that the correct analysis is determining whether "the balance of hardships" tips in their favor. The Defendant, meanwhile, tunes his arguments to the analysis which we suggested on September 2, 1987, and refers at length to two of our decisions discussing the scope of 11 U.S.C. § 362(d)(1), *In re Ronald Perlstein Enterprises, Inc.,* 70 B.R. 1005 (Bankr.E.D.Pa.1987), *appeal dismissed,* C.A. 87–2364 (E.D.Pa., Order filed June 25, 1987); and *In re Stranahan Gear Co.,* 67 B.R. 834 (Bankr.E.D.Pa.1986). Ironically, although we believe that the Defendant has taken the right tack, we cannot support the conclusion which he urges, given the instant factual pattern.

## 3. THE AUTOMATIC STAY APPLIES TO CONTEMPT PROCEEDINGS

Our starting point is another of our decisions relating to the automatic stay, *In re Clark,* 69 B.R. 885 (Bankr.E.D.Pa.1987) (hereinafter referred to as *"Clark I"*). That case contains our strongest statement regarding the power of the automatic stay, in which we designate it as fundamental in nature, *id.* at 889; arising to invalidate all actions taken against the debtor irrespective of his own lack of vigilance in invoking it, *id.* at 889–90; and capable of divestiture only after the debtor receives a full opportunity for a hearing to defend it. *Id.* at 891–093.

Even in the context of that case, however, we recognized certain limitations on

---

1. We should note that we may not have followed these cases on their facts, because they rely on the purported Countryman definition

and there were no pre-petition state court actions to enforce these contracts, which we find decisive here.

the impact of the stay. Citing *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), relied upon by the Plaintiffs here, we recognized that the stay had limited impact on a cause of action which arose post-petition: it could prevent execution on a judgment based on such a cause, but could not prevent the entry of a judgment based on such a claim. *Id.* at 890–91, 893. Subsequently, in response to the creditor's Motion to Alter or Amend our judgment in *Clark I*, we retreated a little further, and allowed the creditor relief from the stay to pursue execution if the debtor failed to provide for the creditor in his plan. *In re Clark*, 71 B.R. 747, 750–51 (Bankr.E.D.Pa.1987) (hereinafter referred to as *"Clark II"*).

Given our belief that the automatic stay is extremely powerful, and allows few exceptions, it is easy to understand why we are reluctant to accept the reasoning of those cases which hold, with no apparent Code referrent, that even civil, as opposed to criminal, see 11 U.S.C. § 362(b)(1), contempt powers of courts other than the bankruptcy court are somehow exempt from the stay. *See International Distribution Centers v. Walsh Trucking Co.*, 62 B.R. 723, 728–30 (S.D.N.Y.1986); *In re Dumas*, 19 B.R. 676, 677–78 (9th Cir.Bankr.App.1982); and *In re Marriage of Lueck*, 140 Ill.App.3d 836, 489 N.E.2d 443, 95 Ill. Dec. 222 (1986). We would be inclined to recognize as exemptions from the power of the stay only those specifically set forth in 11 U.S.C. § 362(b), not court-created exemptions in cases decided under the Bankruptcy Act, such as *David v. Hooker, Ltd.*, 560 F.2d 412, 418 (9th Cir.1977); *In re Spagat*, 4 F.Supp. 926, 927 (S.D.N.Y.1933); or *In re Hall*, 170 F. 721 (S.D.N.Y.1909).

 We find no exception for admittedly civil contempt proceedings brought by private parties suggested by any of the provisions of 11 U.S.C. § 362(b). *Compare* 11 U.S.C. § 362(b)(1) (criminal proceedings, which, as we indicate below could include criminal contempt matters); and §§ 362(b)(4), (b)(5), (b)(8), (b)(9) (certain proceedings by governmental entities). Thus, we see no need to distinguish, in determining the applicability of the stay, between civil contempt proceedings in which monetary, as opposed to injunctive, relief is the motive of the moving party. *See In re Yovish*, Bankr. No. 83–02640T, Adv. No. 83–1806 (Bankr.E.D.Pa., Memorandum Opinion filed Aug. 16, 1983); *In re Thayer*, 24 B.R. 491 (Bankr.W.D.Wis.1982); and *Lueck, supra.* We believe that the automatic stay applies to *all* civil contempt proceedings not exempted by some specific provision of 11 U.S.C. § 362(b), albeit that it may be easier to obtain relief from the stay under a "balancing of the hardships" test when the proceeding focuses solely on injunctive relief. We therefore reaffirm our preliminary holding in this case that the stay does apply, and the only issue is whether the Plaintiffs are entitled to relief therefrom.

4. THE FACT THAT THE PLAINTIFFS DO NOT HAVE A "CLAIM" AGAINST THE DEFENDANT DOES NOT ENHANCE THEIR REQUEST FOR RELIEF FROM THE AUTOMATIC STAY

The first and second closely-related "causes" cited by the Plaintiffs which they contend entitle them to relief from the automatic stay both relate to their argument that the stay should not impact against them because they have no "claim" against the Defendant, as defined by 11 U.S.C. § 101(4), and hence they purportedly cannot be classified as unsecured creditors, whose difficulties in obtaining relief from the stay are chronicled in *Perlstein*, 70 B.R. at 1009–10; *Clark I*, 69 B.R. at 893; and *Stranahan Gear*, 67 B.R. at 837–38.

This argument draws some superficial support from three of the decisions which the Plaintiffs cite which do concern, in a slightly different context, the impact of a bankruptcy filing upon enforcement of non-competition clauses against debtors, *In re Peltz*, 55 B.R. 336 (Bankr.M.D.Fla.1985); *In re Cox*, 53 B.R. 829 (Bankr.M.D.Fla. 1985); and *Cooper, supra.* However, *Peltz* and *Cox* present the following factual scenario, which is distinct from that of the instant case. The respective Debtors had

signed employment contracts prior to filing bankruptcies under Chapter 7. The *Peltz* debtor terminated his employment eight days after filing, and the *Cox* debtor terminated his employment pre-petition. Each apparently listed his former employer as a creditor. After discharge, each then attempted to argue that the employer's cause of action against him under the applicable non-competition clause was discharged and subject to the 11 U.S.C. § 524 post-discharge injunction. The court, the same judge in each case, ruled that § 524 had no pertinence because the respective employers' rights under the non-competition clauses were not "claims."

The *Cooper* debtor, although raising the issue of enforceability of the non-competition clause prior rather than after discharge, made an argument similar to that of the debtors in *Peltz* and *Cox*. After losing in his bid to reject the employment contract under § 365, see pages 68–69 *supra*, he argued that, under § 502(c), the employer had a "claim" against him which could be estimated and subject to discharge. The court agreed that the employer could not raise any monetary claim by reason of the stay, but allowed modification of the stay to permit the employer to pursue injunctive relief, as this portion of the contract was deemed not to be a "claim."

Contrary to the facts of these cases, the Defendant here is not arguing that the Plaintiffs have a "claim" against him which is dischargeable. Nor is that issue significant to his defense. The accuracy of the contention that the Plaintiffs may not be unsecured creditors, because they are not creditors at all, is questionable and, if true, would not, in our view, strengthen their position to obtain relief from the stay in any event. Our language in *Perlstein, Clark I,* and *Stranahan Gear* merely sought to distinguish *secured* creditors from all other parties, not place unsecured creditors in some classification lower than parties not even having claims against debtors. Therefore, we fail to see how the contention that the Plaintiffs do not have a "claim" against the Defendant has any significant bearing on the outcome here.

## 5. OTHER ARGUMENTS RECITED BY THE PLAINTIFFS TO SUPPORT THEIR REQUEST FOR RELIEF FROM THE AUTOMATIC STAY CONSTITUTE INSUFFICIENT GROUNDS IN THEMSELVES FOR SUCH RELIEF.

The third, fourth, and fifth articulated "causes" for relief cited by the Plaintiffs are as follows: (3) The Plaintiffs are suffering harm from the Defendant's conduct; (4) Denying relief would sanction the Defendant's tortious conduct; and (5) The Defendant made it clear that he will continue to violate the injunction unless relief is granted, and hence this bankruptcy would become a haven for a wrongdoer. We believe that each of these articulated "causes" are elements which we must consider in the "balancing of the hardships" test which we deem that we must make to resolve this issue. However, none are, in themselves, sufficient to justify relief from a stay otherwise firmly in place. Moreover, as we indicate at pages 72–74 *infra,* they are not even the primary factors which we take into account in our weighing process.

The sixth "cause" is an argument that the state court proceeding lacks connection with the bankruptcy, like a divorce or child-custody contest, citing the legislative history appearing at H.R.REP. 95–595, 95th Cong., 1st Sess. 343–44 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Strictly as it is presented here, we deem the argument inapposite. The Defendant's employment is the centerpiece of the funding of the Debtors' Chapter 13 Plan. Clearly, his freedom to work in his chosen field of employment is important property of the estate, per 11 U.S.C. § 362(a)(3). The impact of the Plaintiffs' cause of action, unlike a divorce or child-custody matter, is monetary, even as to its enforcement in the future. Hence, this argument is unconvincing in this context.

The seventh "cause," a rebuttal of the Defendant's attempts to invoke § 362 which we already have sustained, need not be addressed further.

The eighth "cause" is an attempt to invoke the principles of equity, comity, and federalism set forth in *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This argument is, we believe, misplaced. Congress has expressly provided, in § 362(a), that a bankruptcy stay shall have a prophylactic impact to halt all other proceedings. As we observed in *Clark I, supra,* 69 B.R. at 889–90, Mr. Justice Black, the author of *Younger v. Harris,* was also the author of *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), which contains the classic statement that, even under the Bankruptcy Act, post-filing state court proceedings are totally *void* in the face of a bankruptcy. Little more need be said on this point.

## 6. THE ANALYSIS OF THE COURT: THE "BALANCE OF THE HARD-SHIPS" TIPS IN FAVOR OF THE PLAINTIFFS.

As we suggested at pages 69–70 *supra,* we believe that the principles set forth in *Perlstein,* the *Clark* cases, and *Stranahan Gear* control this, as any, automatic stay litigation. *See also* 2 COLLIER ON BANKRUPTCY, ¶ 362.07, at 362–59 to 362–60 (15th ed. 1987). Our starting point is our holding, in *Stranahan Gear,* that parties who are not secured creditors have been granted relief where

> two (2) factors have coalesced: (1) the Debtor has engaged in some morally culpable conduct which the moving party seeks to undo in a court action; and (2) the creditor does not seek to pursue assets of the estate or is prohibited from doing so, although given relief to pursue certain remedies against the debtor. 67 B.R. at 837–38.

In *Perlstein,* where the two factors mentioned above were arguably present, the moving parties' case was marred by their failure to meet their burden of producing evidence to support the presence of these factors.

The Plaintiffs here fare far better. They have presented evidence of morally culpa-ble conduct of the Defendant, which he admitted on the record. Also, by the testimony of Mr. Breidenbach, the Plaintiffs presented very convincing evidence that they appreciated the sensibility of pursuing only prospective, injunctive relief against the Defendant in state court.

Of course, in neither *Perlstein* nor *Stranahan Gear* did we indicate that we would necessarily grant relief from the stay upon proof of the presence of these two elements. However, their establishment definitely places the Plaintiffs in a stronger position than that of the respective movants in either of those two cases.

Another significant element, upon which we focused in the two *Clark* Opinions, is the interplay between the automatic stay and post-petition claims. As the *Clark I* decision, citing *Frenville, supra,* 744 F.2d at 338 n. 11, indicates, 11 U.S.C. §§ 362(a)(3) and (a)(4), if not the other sections of § 362(a), do impact on post-petition causes of action. Here, unlike *Clark,* § 362(a)(4) is not in issue. But § 362(a)(3) arguably is in issue, because the Defendant's freedom to work in the seafood (or at least the *food* ) industry is probably the most valuable of the assets of the Debtors' estate. It will also be recalled that, in *Clark II,* while refusing to hold that confirmation of the debtor's plan eliminated the impact of § 362(a)(3) altogether, we did hold that relief from the stay was warranted if the debtor failed to include payment towards the post-petition creditor's claim in his plan.

The facts of the *Clark* cases are, of course, quite distinct from those here. However, our *Clark* holding indicates our belief hat the impact of § 362(a)(3) becomes fainter and fainter as the Chapter 13 case proceeds forward and post-petition claims continue to mount.

In this regard, the decision in *In re Riso,* 58 B.R. 978 (Bankr.D.N.H.1986), is relevant. In that case, the Debtor invoked § 362 to argue that his employer was prevented from enforcing a non-competition clause in an employment contract against him. The Debtor alleged that the contract was in place on the date of the filing of his

case, but did not allege a pre-petition breach of the contract. The employer moved to dismiss. In dismissing the complaint with leave to amend, the court held, citing *Frenville,* that, if the "triggering event" of the breach of the contract occurred post-petition, the complaint would fail to state a cause of action.

*Riso* is distinguishable from this case. Here, the "triggering event" of breach and, indeed, the state court lawsuit seeking a remedy for the breach did occur pre-petition. Furthermore, the *Riso* court does not discuss the potential impact of § 362(a)(3) even if the "triggering event" did occur post-petition. However, like the *Clark* cases, the *Riso* decision supports the principal that the impact of the automatic stay upon post-petition conduct is significantly less than its impact on pre-petition conduct.

Here, the Plaintiffs expressly agreed to confine their future state court proceedings to the pursuit of relief to prevent further post-petition violations of the employment contract by the Defendant. Hence, the impact of the stay is diminished.

Another factor is the repeated exposure of the state court to this case and our belief that the state court is best suited to modify or enforce the specific features of its injunction. The longstanding pendency of the state court action to enforce the non-competition clause in the Agreement is in itself at least a slight factor in the equation. *See In re Wheeler Group, Inc.,* 75 B.R. 200 (Bankr.S.D.Ohio 1987) (stay relief granted to pursue employment discrimination suit in federal district court, which had been "through very substantial adjudicatory steps" in the proceeding).

We also note that the state court has not been precipitous in enforcing the Agreement, having stayed its own hand from entering any order in the proceedings in March, 1987. The Defendant asks us to invoke our power pursuant to 11 U.S.C. § 105(a) to limit the scope of the state court injunction to non-competition in the *seafood* business, as opposed to the entire food industry. We do not doubt our power to utilize § 105(a) to do this, *see, e.g., N.L. R.B. v. Superior Forwarding, Inc.,* 762

F.2d 695, 698 (8th Cir.1985), but we believe that such powers should be sparingly exercised in only truly extraordinary circumstances. *See In re Monroe Well Service, Inc.,* 67 B.R. 746, 750–53 (Bankr.E.D.Pa. 1986); and *In re Metro Transportation, Inc.,* 64 B.R. 968, 974 (Bankr.E.D.Pa.1986). We will, in our Order, restrict the Plaintiffs from seeking any relief in the state court action other than prospective injunctive relief, as per their own disclaimer. However, we shall defer to the state court in deciding whether to limit the injunction. That court is doubtless aware of the clash between encouragement of free enterprise and enforcement of contractual restrictive covenants, and the resultant principle that a restrictive covenant may be enforced in Pennsylvania only to the extent necessary to reasonably protect the employer. *See Gagliardi Bros. v. Caputo,* 538 F.Supp. 525, 527, 529–30 (E.D.Pa.1982); and *Westec Security Services, Inc. v. Westinghouse Electric Corp.,* 538 F.Supp. 108, 121–26 (E.D.Pa.1982). Thus, the state court may well decide to modify its prior order and limit the scope of the injunction to only the seafood industry, as opposed to the entire food industry. However, we shall stay our hand from becoming further involved in the scope of the state court proceedings and defer to the court which has conducted plenary proceedings in this matter.

Further, certain other aspects in the underlying balance of the harms which are against the Debtor influence our decision. There is no question that the Defendant had, rather unapologetically, consistently disregarded the non-competition agreement and the state court injunction enforcing it, both prior to and subsequent to this bankruptcy filing. The actual admission of such defiant conduct on the record, as compared to the unproven allegations of fraud in *Perlstein,* is not a predominant factor, in our view, but the nature of the debtor's conduct cannot be overlooked entirely. *See In re Turner,* 55 B.R. 498 (Bankr.N.D.Ohio 1985) (Debtor alleged to have violated Racketeer Influence Correct Organization Act (hereinafter referred to as "RICO")); *In re Humphreys Pest Control Co.,* 35 B.R. 712 (Bankr.E.D.Pa.1984) (Debtor al-

leged to have violated RICO as well as having engaged in common law fraud); *In re Larkham*, 31 B.R. 273 (Bankr.D.Vt. 1983) (Willful and malicious conduct of Debtor alleged); and *In re Highcrest Management Co.*, 30 B.R. 776 (Bankr.S.D. N.Y.1983) (Debtor alleged to have committed fraud).

Finally, the Plaintiffs made at least some showing of harm which they will suffer if relief from the stay is denied. Their business has been drastically adversely affected by the Defendant's separation. Although direct proof on this element was skimpy, we can certainly infer, in light of the Defendant's conduct, that a goodly portion of these detrimental effects were caused directly by the Defendant's head-to-head competition with them, and that these effects will continue in the future if relief is denied.

Therefore, applying the balancing test which we indicated in *Perlstein*, the *Clark* cases, and *Stranahan Gear* must be employed to resolve such matters, we hold that the Plaintiffs here are entitled to relief from the automatic stay to pursue prospective injunctive relief to remedy allegedly illegal post-petition conduct of the Defendant.

An Order consistent with this conclusion shall be entered.