**In re W.S.M. ENTERPRISES, INC., Debtor.**

**Daniel ROSEN, et al, Plaintiffs,**

v.

**W.S.M. ENTERPRISES, INC., Defendant.**

**Bankruptcy No. 87–5–1680–JS.
Adv. No. A89–0139–JS.**

United States Bankruptcy Court, D. Maryland.

June 15, 1989.

Bruce Ezrine, David H. Weinstein, Baltimore, Md., for plaintiffs.

Howard A. Rubenstein, Sarah Longson, Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, Md., for defendant.

## MEMORANDUM OPINION DISMISSING COMPLAINT FOR INJUNCTIVE RELIEF

JAMES F. SCHNEIDER, Bankruptcy Judge.

By this decision, the United States Bankruptcy Court for the District of Maryland at Baltimore will deny specific performance to a prepetition agreement for the presentation of comedy shows on the debtor's premises entered into between a restaurant in Chapter 11 and two professional comedians where the agreement (1) provides for personal services to be performed indefinitely and is therefore terminable at will by either side; (2) is not exclusive so as to prohibit others from performing; and (3) does not provide consideration for non-competition provisions which are therefore held to be unenforceable.

## FINDINGS OF FACT

1. W.S.M. Enterprises, Inc. filed a voluntary Chapter 11 bankruptcy petition in this Court on July 24, 1987 (Case No. 87–5–1680–JS). The debtor-in-possession is a Maryland corporation engaged in the business of owning and operating a restaurant and pub at 102 Water Street in the city of Baltimore.

2. Prior to the filing of bankruptcy, W.S.M. Enterprises, Inc., entered into an agreement with the plaintiffs, Daniel Rosen and Robert Somerby, the terms of which are set forth in the margin.[1]

1. THIS AGREEMENT is entered into this day of April, 1984, by and between W.S.M. Enterprises, Inc., a Maryland Corporation, and Daniel Rosen, whose address is 29 Willow St., Towson, MD., and Robert Somerby, whose address is 1213 Bolton St., Baltimore, MD. 21217.

WHEREAS, W.S.M. Enterprises, Inc. owns and operates a bar and restaurant under the style and trade name, "Jean Edouard Restaurant and Pub", (hereinafter referred to as "Jean Edouard"), located at 102 Water Street, Baltimore, Maryland, occupying the basement, first floor and second floor, and

WHEREAS, Daniel Rosen and Robert Somerby own and operate a comedy club, (hereinafter referred to as the "Club"), an unincorporated association, which is engaged in performing comedy acts before the public, and

WHEREAS, the Club is desireous [sic] of performing their [sic] acts on the second floor of Jean Edouard's premises, and

WHEREAS, Jean Edouard is desireous [sic] of allowing the Club to use the second floor of its premises,

NOW, THEREFORE, in consideration of the mutual promises and other good and valuable considerations, the receipt of which is hereby acknowledged from one to the other, the parties hereto agree as follows:

WITNESSETH:

The foregoing is not merely prefatory, but is expressly made a part of this agreement.

1. This agreement shall be effective April  , 1984, and shall continue thereafter unless either party gives the other written notice of its intention to terminate this agreement, in accordance with Paragraph 9a or 9b.

2. Jean Edouard agrees to furnish, without charge to the Club, the following:

(a) the entire space on the second floor of the building, 102 Water Street, excluding the bar and the service bar area.

(b) all utilities, including electric, heat, air conditioning and water.

(c) maintenance, repairs and cleaning of the premises and equipment therein, but excluding any equipment owned by the Club.

(d) waitresses, bartenders, cashiers and other personnel as may be reasonably required, but excluding performers or other personnel of the Club.

(e) all payroll taxes, workmen's compensation insurance, fire, liability and other hazard insurance covering all employees furnished by Jean Edouard, as well as public liability and property damage incurance [sic].

(f) furnishings, such as tables, chairs, and other accouterments.

(g) one free dinner for each evening the Club is performing for the headliner, master of ceremonies and feature performer.

3. The Club agrees to furnish, without charge to Jean Edouard, the following:

(a) for each performance by the Club, a master of ceremonies, a headliner and a fea-

3. After the execution of the agreement, the name of Jean Edouard was changed to "Winchesters," after John E. Winchester, Jr., the president of W.S.M. Enterprises, Inc.

4. From 1984 until April 15, 1989, Robert Somerby and Daniel Rosen managed a comedy club trading as "Charm City Comedy Club" on the second floor of the debtor's premises at 102 Water Street, pursuant to the foregoing agreement. During that period, a number of provisions in the agreement were altered by oral agreement. One such alteration was the elimination of the bonus provision in paragraph four by which the comedy club was to receive a premium in the event of a sell-out. At some point during the time that the comedy club was operating on the premises, a new agreement was reduced to writing, but was never signed by the parties. No copy of any such agreement was offered into evidence by either side.

ture performer, to perform for a period of one and one-half hours to two hours.

(b) to provide two performances each Friday and Saturday night, at times mutually agreeable between the parties, and on such other evenings and at such other times as the parties shall agree.

(c) to provide and maintain such equipment as may be needed by the Club for its performances, including but not limited to sound and light systems.

(d) furnish evidence of workmen's compensation insurance covering its headliners, masters of ceremonies, feature performers and other employees or sub-contractors, to Jean Edouard.

4. Jean Edouard agrees to collect an admission or cover charge from each customer for each performance, in the amount of $4.50, plus applicable State and Federal taxes, if any, or such other admission or cover charge as the parties shall mutually agree to, and shall account for and remit the total of such charges each week to the Club within 72 hours after the last performance Saturday night. Jean Edouard shall consider 110 paid admissions at any show to constitute a sell-out, and therefore the club shall receive a premium of ten additional seat charges at the prevailing cover charge less taxes. All other sales and/or other charges made by Jean Edouard shall belong to Jean Edouard.

5. Any suspensions of performances and vacations shall be at such times and for such periods as the parties shall mutually agree to.

6. The Club agrees to advertise the location of their [sic] performances as being at Jean Edouard Restaurant and Pub, 102 Water Street, Baltimore, Maryland.

7. The Club agrees to furnish such personnel as may be reasonably required to assist in taking reservations and patron seating.

8. The Club agrees to maintain at all times sufficient capital to pay its costs and expenses for a period of one month.

9. Termination:

(a) Upon notice of termination of this agreement by Daniel Rosen and Robert Somerby they agree, notwithstanding any assignment pursuant to paragraph 10 hereunder, to work and insure continuing quality for six weekends, maintain talent costs from previous six weekends, difference payable to W.S.M. Ent., Inc. Both Daniel Rosen and Robert Somerby agree not to engage as comedy club principals, agents, investors, owners, officers, or employees, directly or indirectly, but not to preclude performing, for a period of nine months from date of written notice, within a radius of five miles of 102 Water St., Baltimore, Maryland 21202.

(b) Upon written notice of termination of this agreement by W.S.M. Ent., Inc., W.S.M. Ent., Inc. agrees to allow Daniel Rosen and Robert Somerby the right to perform. Daniel Rosen and Robert Somerby agree, notwithstanding any assignment pursuant to paragraph 10 hereunder, to work and insure continuing quality for six weekends, difference payable to W.S.M. Ent., Inc., and not to engage as comedy club principals, agents, investors, owners, officers or employees, directly or indirectly, but not to preclude performing, for a period of 3 months from date of written notice within a radius of five miles of 102 Water St., Baltimore, Maryland 21202. W.S.M. Ent., Inc. agrees not to stage comedy shows at Jean Edouards for a period of 3 months from the last performance given by Daniel Rosen or Robert Somerby.

10. This agreement may be assigned by the Club to a corporation, the capital stock of which is owned exclusively by Daniel Rosen and Robert Somerby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement this _____ day of May, 1984.

Attest:  W.S.M. Enterprises, Inc.

/s/  By: _____ /s/
_____  (seal) _____
  John E. Winchester, Jr., President

Witness:

/s/  _____ /s/ _____
_____  Daniel Rosen

/s/  _____ /s/ _____
_____  Robert Somerby

Plaintiff's Exhibit No. 1.

5. On April 12, 1989, during the pendency of the instant Chapter 11 bankruptcy case, the following certified letter was sent to Daniel Rosen and Robert Somerby by David S. Pearl, an attorney-at-law purporting to act on behalf of W.S.M. Enterprises, Inc.:

April 12, 1989

FIRST CLASS
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
Mr. Daniel Rosen
29 Willow Street
Towson, Maryland 21204
Mr. Robert Sommerby [sic]
1213 Bolton Street
Baltimore, Maryland 21217

Re: The Charm City Comedy Club

Gentlemen:

Please be advised that this office represents W.S.M. Enterprises, Inc. D.I.P. My client, does hereby elect to terminate the Agreement executed by you and my client, concerning the Comedy Club located at 102 Water Street. My client makes this election pursuant to Paragraph 9(b).

Notwithstanding the terms of said Paragraph, my client is willing to forgive your continuing obligations under the said Paragraph dealing with a non-competition clause, and the duty to work for six (6) weekends as required by the clause, if the same courtesy is extended to my client.

Please contact this office so that we can discuss the situation.

Very truly yours,
/s/
David S. Pearl

Plaintiffs' Exhibit No. 2.

6. The docket of the instant Chapter 11 bankruptcy case indicates that no application was ever filed with this Court for the purpose of engaging Mr. Pearl as special counsel to the debtor-in-possession, nor therefore was any order ever entered authorizing him to represent the debtor-in-possession.

7. The following Friday and Saturday evenings, April 14 and 15, 1989, Charm City Comedy Club made its final performances at Winchesters. By all accounts, at the conclusion of the Saturday night show, Mr. Rosen removed from the premises all the personal property belonging to the comedy club, including the microphone and speakers which comprised the sound system employed by the stand-up comics booked by Messrs. Rosen and Somerby.

8. Thereafter, Mr. Winchester inserted an advertisement in the April 21, 1989 edition of the *City Paper*, a local tabloid, in which another comedy club replaced Charm City Comedy Club. The relevant wording of the advertisement stated as follows:

WINCHESTERS
in the
CHARM CITY
presents
GARVINS
COMEDY
CLUB

Plaintiff's Exhibit No. 3, p. 36.

9. The plaintiffs filed the instant complaint for preliminary and permanent injunction on April 19, 1989. Simultaneously, they filed a separate application for preliminary injunction [P. 3] and a request for immediate hearing [P. 4]. Despite the fact that the plaintiffs filed no application for a temporary restraining order, this Court granted them an immediate hearing on April 21, 1989. Before the hearing began, the debtor filed an answer [P. 5].

10. The plaintiffs contended that the agreement between the parties dated April, 1984 is an executory contract, and by their complaint sought from this Court an order decreeing its specific performance by the debtor. They argued that the debtor cannot unilaterally reject an executory contract without the prior approval of the bankruptcy court, and that they would suffer irreparable harm if this Court did not order the debtor to reinstate their comedy club on the premises at 102 Water Street. The plaintiffs complained that despite their status as creditors, they were never notified of the filing of the instant Chapter 11 case.

11. The debtor acknowledged that the plaintiffs were not listed as creditors but justified that omission on the ground that

the plaintiffs were not creditors at the time the Chapter 11 petition was filed. Additionally, the debtor argued that because the plaintiffs could sue for money damages resulting from the termination of the contract, they have an adequate legal remedy which precludes their obtaining equitable relief.

12. After a hearing on the record in chambers at which both sides presented arguments and proffers of testimony, this Court declined to issue a temporary restraining order to reinstate the plaintiff's comedy club on the premises, holding that even if it were an executory contract, the agreement called for personal services which could not be assumed or enforced by the debtor.[2] Moreover, the plaintiffs had not asked for a temporary restraining order, but merely an immediate hearing on an application for preliminary injunction. Thereafter, a full evidentiary hearing on the complaint was held on April 25 and 26, 1989, at which time both sides elicited testimony from witnesses, introduced documentary evidence and submitted oral argument.

13. In the meantime, the plaintiffs filed an amended complaint [P. 6] and an amended application for preliminary injunction [P. 7] on April 24, 1989, requesting this Court to (1) specifically enforce their agreement with W.S.M., that is, to reinstate the Comedy Club on the debtor's premises and permit the plaintiffs to stage comedy shows there; (2) enjoin the debtor from terminating the agreement; (3) "enter a Temporary Restraining Order enjoining [d]ebtor from entering into any agreement under which Garvin's or any entity other than Charm City would operate a comedy club on the third floor of 102 Water Street for a period of time not to exceed three months;" (4) in the alternative, grant the plaintiffs a modification of the automatic stay "in order that this matter may proceed before a State Court." *Amended Application for Preliminary Injunction* [P. 7].

14. Daniel Rosen testified that neither he nor his partner and co-plaintiff, Robert Somerby, paid rent or tendered any other medium of exchange to the debtor for the use of its premises.

15. Both sides have presumed the agreement at issue in this case to be an executory contract. The debtor has so characterized it by including it in a schedule of executory contracts filed in the bankruptcy case. The plaintiffs have claimed that the debtor's "attempt to unilaterally terminate its contract with Charm City without the prior approval of this Court" was improper. *Id.* paragraph 3 [P. 7].

CONCLUSIONS OF LAW

1. The instant complaint is procedurally defective because it does not contain "a short and plain statement of the grounds upon which the court's jurisdiction depends ..." Fed.R.Civ.P. 8; Bankruptcy Rule 7008. However, in the heat of battle, this error was overlooked by everyone, and the Court proceeded to an adjudication on the merits. Because the Court has independently determined that it has subject matter jurisdiction and because neither contestant has objected, such adjudication is proper.

---

2. "Where an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the trustee has traditionally been unable to assume or assign the rights of the bankrupt in such contract. Under the Act there was the additional question of whether such contracts would be property of the estate. Whether or not a contract involves personal skill, trust, or confidence sometimes will involve close distinctions, depending upon the nature of the subject of the contract, the circumstances of the case and the intent of the parties to the contract.

"Section 365(c)(1)(A) expressly deals with the problem of personal service contracts by precluding assumption or assignment, if applicable non-bankruptcy law would excuse the other party from accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession whether or not the contract or lease prohibits or restricts assignment of rights or delegation of duties. Thus clauses in the contract or lease attesting to a personal relationship will not be dispositive. Rather non-bankruptcy law must excuse the nondebtor party from accepting performance from the trustee even in the absence of such clauses. The wording of the subsection is such that considerably more contracts than those which one would normally consider personal service contracts are affected." 2 *Collier on Bankruptcy,* ¶ 365.05 (15th ed. 1988).

2. The jurisdiction of the bankruptcy court has been established by Congress in Sections 1334 and 157 of Title 28 of the U.S.Code,[3] as amended and supplemented

3. § 1334. Bankruptcy cases and proceedings.

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain made under this subsection is not reviewable by appeal or otherwise. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C. § 1334 (Supp. V 1987).

§ 157. Procedures

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under Chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

(4) Non-core proceedings under section 157(b)(2)(B) of title 28, United States code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered

by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, Title I, §§ 101(a) and 104(a), 98 Stat. 333, 340.

3. The bankruptcy court has subject matter jurisdiction over the instant complaint which is a core proceeding involving the allowance or disallowance of claims against the estate, arising in the instant bankruptcy case, which this Court may hear and determine. 28 U.S.C. § 157(b)(1), (b)(2)(A), (B), (G) and (O) (Supp. V 1987).

4. Section 365(a) of the Bankruptcy Code permits a bankruptcy trustee "subject to the court's approval, to assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (Supp. V 1987). Section 1107(a) confers upon a debtor-in-possession the same rights, powers and duties as a bankruptcy trustee (with some exceptions not relevant here). 11 U.S.C. § 1107(a) (Supp. V 1987).

5. "The courts have for years struggled to define the meaning of the term 'executory contract' as used in the bankruptcy or rehabilitative context. See, Countryman, Executory Contracts in Bankruptcy, 57 Minn.L.Rev. 439 (1973) and 58 Minn.L. Rev. 479 (1974). It is conceded in the legislative history to § 365(a) of the Code that no precise definition exists but it is noted that executory contracts generally include contracts on which performance remains due to some extent on both sides. H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) 347, U.S.Code Cong. & Admin.News 1978, p. 5787; S.Rep. No. 95–989, 95th Cong.2d Sess. (1978) 48, U.S.Code Cong. & Admin. News 1978, p. 5787. More specifically, however, an executory contract has been defined as one in which a party binds himself to do *or not do a particular thing*, whereas an executed contract is one in which the object of the agreement is already performed. *Farrington v. Tennessee*, 95 U.S. 679, 683, 24 L.Ed. 558 (1877); *In re American Magnesium Company*, 488 F.2d 147, 152 (5th Cir.1974)." *In re Rovine Corp.*, 5 B.R. 402, 404 (Bankr.W.D. Tenn.W.D.1980).

6. Other courts which have addressed the question have described the attributes of executory contracts. *See e.g. In re Cherry*, 78 B.R. 65, 68 (Bankr.E.D.Pa.1987) (executory contract is one which has not yet been fully completed or performed on either side); *In re Cooper*, 47 B.R. 842, 844 (Bankr.W.D.Mo.1985) (executory contract is generally taken to mean any agreement in which substantial performance obligations remain on each party); *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1045 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (a contract is executory if the obligations of both parties to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other).

7. The Court in *Rovine, supra*, held that a covenant not to compete was an executory contract because performance remained due to some extent on both sides. 5 B.R. at 404.

8. In *Matter of Central Watch, Inc.* 22 B.R. 561 (Bankr.E.D.Wis.1982), it was held that although the former president of a corporation had resigned, his employment contract was executory because he was still under an obligation for two years to

by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157 (Supp. V 1987).

refrain from competing with the former employer. *Id.* at 564.

9. In *Lubrizol, supra,* the Fourth Circuit reviewed a contract in which the debtor had agreed to refrain from using a metal coating process technology in return for the payment of royalties. Together with the duty of non-use of the technology, the debtor's obligations included the requirement to notify Lubrizol of any patent infringement suits. The Court held that "[t]he unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory...." 756 F.2d at 1045. The Court noted that the unperformed, continuing duty of forbearance was a key factor in determining that the contract was executory. *Id.* at 1046. The obligation in *Lubrizol* went beyond a mere promise to pay money, because the debtor promised in return to refrain from using the technology and was required to perform certain duties. *Id.*[4]

10. The agreement in the instant case may be broadly characterized as an employment contract, because it calls for the parties to render personal services which are beneficial to each other. However, the plaintiffs are neither agents nor employees of W.S.M. They receive no wages, salary or commissions from the debtor. The remuneration they receive is the totality of admission charges paid at the door by members of their audience.[5] The parties carry on businesses that are separate and distinct from each other: the debtor manages a restaurant and bar; the plaintiffs, a comedy club on the debtor's premises.[6] The comedy club and restaurant each employs a separate staff, pays its salaries and furnishes the employees work-

ers' compensation insurance. The parties are not partners because a partnership requires an association of two or more partners to carry on a business for profit as co-owners. *See* 59A Am.Jur.2d *Partnership* § 2 (1987). In the instant case, there is no co-ownership and no sharing of profits and losses. Neither are the parties joint venturers, because as in a partnership, a joint venture contemplates the sharing of profits and losses by the parties who are associated in a common business enterprise. *See* 46 Am.Jur.2d *Joint Ventures* § 3 (1969), wherein it is said:

> And a joint venture is to be distinguished from a relationship of independent contractor, the latter being one who, exercising an independent employment, contracts to do work according to his own methods and without being subject to the control of his employer except as to the result of the work, while a joint venture is a special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.

*Id.*, citing *Albina Engine & Machine Works, Inc. v. Abel,* 305 F.2d 77 (10th Cir.1962).

The plaintiffs are not subject to the debtor's direction as to the manner in which their services are to be performed. The agreement gives neither party the right to direct the manner of the other's performance. Additionally, it is noted that the agreement does not bind the plaintiffs to perform exclusively on the debtor's premises. Under these circumstances, this Court finds the plaintiffs to be independent con-

---

**4.** The five preceding conclusions of law are taken from the recently-published decision of this Court in the case of *In re Constant Care Community Health Center,* 99 B.R. 697 (Bankr.D.Md. 1989), the holding of which is that an employment agreement containing a covenant not to compete and a deferred compensation provision continuing in effect after the debtor's employee's resignation "is an executory contract which the debtor could reject as being burdensome to the estate." 99 B.R. at 702.

**5.** That the debtor's employees collect these funds does not change the status of the parties.

All of the proceeds are remitted to the comedy club. It is seemingly more convenient for the debtor to furnish the employees who collect the admission.

**6.** The agreement is not simply a contract to provide entertainment to patrons of the restaurant. The comedy club occupied a different floor in the same building as the restaurant. Therefore, even the patrons of the comedy club might be separate and distinct from patrons of the restaurant.

tractors. *See* 9 *Williston on Contracts;* 3rd ed. §§ 1012, 1012A (1967), *citing N.L.R.B. v. A.S. Abell Co.*, 327 F.2d 1 (4th Cir.1964) ("totality of the circumstances, including degree of control").

11. The agreement at issue in this case, if it is a contract at all, is a bilateral contract, because it has for its consideration the mutual promises of the parties. Laurence P. Simpson, *Handbook of the Law of Contracts,* §§ 6,55 (2nd ed. 1965).

■ ■ 12. However, because the contracting parties failed to specify a definite term of duration in the agreement, the agreement is terminable at the will of either party. For, as stated by Professor Corbin:

> Not infrequently parties make an agreement containing promises of reciprocal continuing performances to be rendered for a period of time that is not specified expressly or impliedly. This is especially true of employment agreements. If, on proper interpretation, the parties intend that performance is terminable at will by either party and there is no executed consideration, the agreement is not a contract at all. Yet it is not vague or unclear. It is merely an expression in which the promises are illusory, since refusal is not a breach, being merely the exercise of the reserved power to terminate.
>
> Although the agreement is not a contract, it is not totally inoperative. In many cases, such an agreement is an operative offer that can be accepted by rendering all, or some indicated portion, of the service or other performance agreed upon. Such a rendition of performance, before any notice of revocation, binds the other party to pay the specified compensation. If the party rendering performance has made no promise of any other performances, either expressly or tacitly, the contract now created is a unilateral contract ...

*Corbin on Contracts* § 96 (1963). *Accord* 1 *Williston on Contracts* 3rd ed. § 39 (1957) ("a hiring indefinite as to time is terminable at the will of either party and therefore creates no executory obli-

gations") citing among other cases *Warden v. Hinds,* 163 F. 201 (4th Cir.1908).

13. The parties indicated their intention that the agreement should be terminable at the will of either of them because they specified what each should do in the event of termination of the agreement by the other. The plaintiffs promised that if they terminated the agreement, they would conduct the comedy club for six more weekends at the same cost, "difference payable to W.S.M. Ent., Inc." The debtor promised that if it terminated the agreement, it would "allow Daniel Rosen and Robert Somerby the right to perform." If the plaintiffs terminated, they agreed not to engage in the management of a comedy club within a radius of five miles of 102 Water Street for nine months from the date of written notice of termination, although they were not precluded from performing comedy themselves. If W.S.M. terminated, it agreed "not to stage comedy shows at Jean Edouards [sic] for a period of 3 months from the last performance given by Daniel Rosen or Robert Somerby." *Agreement,* paragraphs 9A and 9B [Plaintiffs' Exhibit No. 1].

14. Oddly enough, even if the parties had specified that their agreement were to endure permanently, the end result would have been the same as in the instant case. Because such a provision does not establish a definite duration, lifetime employment contracts have been held in a number of cases to be terminable at will. *See e.g. Winand v. Case,* 154 F.Supp. 529 (D.Md. 1957); *C & P Telephone Co. v. Murray,* 198 Md. 526, 84 A.2d 870, 28 A.L.R.2d 920 (1951); *Baltimore & Ohio R. Co. v. King,* 168 Md. 142, 176 A. 626 (1935); *Heckler v. Baltimore & Ohio R. Co.,* 167 Md. 226, 173 A. 12 (1934).

15. "Equity will not enforce a contract specifically which, by its terms or by operation of law, the defendant may terminate immediately, such as a contract to enter into a partnership, joint venture, or other voluntary association, or lease, or other contract terminable at the will of the defendant." 11 *Williston on Contracts,* 3rd ed. § 1442 (1968).

16. According to this analysis, the agreement in the instant case is not an executory contract. When Mr. Rosen removed the microphone and speakers at the conclusion of the plaintiffs' last performance of the comedy club on April 15, 1989, the agreement was fully executed. The plaintiffs had rendered their promised performance. The termination of the agreement by the debtor was not a breach of contract; and if not a breach, then there is no cause of action for damages. Accordingly, the Court finds that the plaintiffs are not creditors of the estate.

17. The instant agreement, which had been in effect for five years and which had obviously benefitted the debtor's business, should not have been terminated without notice to, and advance approval of the bankruptcy court, especially where the debtor believed the agreement to be an executory contract. The action taken by the debtor in this case was unwise and under different circumstances might have spelled disaster to the estate's prospects for reorganization. However, where the agreement *was* terminable at will, and the termination was within the scope of the authority of a debtor-in-possession, the bankruptcy court will not require the debtor to go through the meaningless ceremony of obtaining a confirmatory order of court. The fact that the notice of termination was written and dispatched on behalf of the debtor by an attorney whose services were not approved in advance by the Court is of no moment. In the context of this case, the failure of the debtor to obtain the Court's advance approval of David Pearl as its attorney means only that he will not receive any compensation for services rendered to the estate.[7] It had no effect on Mr. Pearl's apparent authority to do what he did, particularly where his service was merely ministerial and not legal in nature. In other words, where the agreement was terminable at will, the message of termination was effective regardless of whether the messenger had the bankruptcy court's stamp of approval.

18. In the instant case, however, the plaintiffs alternatively urge the Court to give effect to the intention of the parties in consequence of the termination of their agreement, that is, to enforce the negative covenants against competition and the positive requirement that upon termination by the debtor, the plaintiffs be permitted to continue to perform for six weeks.

The Court declines to do this for several reasons. First, the negative covenants are unenforceable for lack of consideration. Because the agreement was non-exclusive, the Court has found that during the life of the agreement, the parties were free to contract with others for the services they promised to render to each other. Thus, on nights other than Fridays and Saturdays, W.S.M. was not barred by the agreement from inviting other comedians or comedy clubs to perform on its premises, and the plaintiffs were not barred from presenting their performances elsewhere. The parties having thus failed to condition their promises upon exclusive performance to each other, there is no consideration to enforce a non-competition covenant *after* the non-exclusive agreement has terminated.[8] Second, the non-competition clauses fail for a lack of mutuality of obligation. The restraints in these clauses appear at first blush to be more onerous to the plaintiffs than to the debtor. In the event the agreement is terminated, the plaintiffs are obligated to maintain the Charm City Comedy Club for six more weeks at Winchesters and thereafter to desist for nine months from staging shows under the name "Charm City Comedy Club" within a radius of five miles from the restaurant. However, the Court finds that even this promise is illusory. Because of an exception to the

---

7. *See* 11 U.S.C. §§ 327(e), 328 (Supp. V 1987).

8. Not to be overlooked in this analysis is the illusory promise contained in the agreement which provided that "suspensions of performances and vacations shall be at such times and for such periods as the parties shall mutually agree to." *Agreement,* paragraph 5 [Plaintiffs' Exhibit No. 1]. Because a determination of the effect of this provision upon the agreement is not required for the Court's disposition of this case, the Court expresses no opinion as to its materiality.

prohibition against the staging of comedy acts which permits the plaintiffs *as individuals* to continue to *perform* comedy during the nine months and presumably within the prohibited zone, the plaintiffs would be perfectly free to continue their business, albeit not in the guise of a comedy club. By contrast, W.S.M. is precluded from presenting *any* comedy performances for three months. This would amount to a penalty which would serve the interests of neither party and which would not be in the best interest of the estate or its creditors. Additionally, the obligation that the comedy club must continue to perform at Winchesters for six weeks after notice of termination is given *by either party* could not be enforced against the plaintiffs if they had terminated the agreement, because the agreement itself is terminable at will.

19. Where an agreement is terminable at will by both parties, as in the instant case, (and therefore, termination by either is not a breach), an injunction will not lie against such termination.[9]

20. Additionally, the plaintiffs have failed to comply with the procedural requirements for granting injunctive relief. The complaint is unverified and unaccompanied by an affidavit clearly setting forth the specific facts which would justify the granting of a temporary restraining order. Indeed, they have not even filed a formal application for a temporary restraining order. *See* Fed.R.Civ.P. 65.

21. It follows that the Court will neither grant specific performance to the agreement nor enjoin the debtor from contracting with a substitute comedy club. In the event that a new long-term contract is contemplated, it must be in writing and contain specific provisions as to duration, consideration, the obligations of the parties and other formalities, and must be submitted for court approval in advance.

9. *Cf. Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir.1977), which, despite its holding that "likelihood of success" is not the prime consideration in the decision to grant interlocutory injunctive relief, nevertheless requires a plaintiff to raise "questions going

22. Finally, the plaintiffs' request that the automatic stay be modified, though not properly before this Court in the form of a motion, Bankruptcy Rule 9014, will be denied. This Court having taken jurisdiction of this complaint and having adjudicated it on the merits, there is nothing left for the state court to hear.

For all these reasons, the amended complaint will be dismissed.

ORDER ACCORDINGLY.

to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* at 195. The plaintiffs in the instant case have failed to raise such questions.